**David W. GARRIS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 21142.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 15, 1967.

Decided Feb. 14, 1968.

---

See also, D.C., 262 F.Supp. 175.

————————

Mr. Charles R. Cutler, Washington, D. C. (appointed by this court), for appellant.

Mr. Scott R. Schoenfeld, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

On this appeal from convictions of rape, robbery, and unauthorized use of a motor vehicle, reversal is sought by reason of certain errors allegedly occurring in the course of a jury trial. We find merit in only one of these claims, but that one makes a new trial imperative. It involves the prosecutor's arguing facts to the jury which he had been unable to get into evidence over a defense objection. Capital cases involving brutal crimes of the kind involved here are not mere games, but there are some—even though it be assumed, as we do, to have been inadvertent and unintended—fundamental rules to be observed. The failure to do so here imposes the burden of a new trial on an already over-extended trial court.

I.

A key prosecution witness was the victim's sister. It was her testimony alone that provided eye-witness evidence of appellant's presence at the scene of the alleged criminal events.[1] After the rape and robbery the victim's car was driven away by the assailants, and the following day the sister was asked to identify the two persons found in the car when it was recovered. Although this situation was instinct with the dangers of an over-readiness to respond affirmatively, the sister was apparently quite clear that neither of these persons was the one she had seen. This circumstance would, of course, tend to give great weight to her identification of appellant. In any event, after the sister on her direct examination had testified as to her identification of appellant, the prosecutor asked her about the two other persons:

Q. All right. When you saw those two young men on Friday, could you

1. The victim was attacked as she was leaving her car in the underground garage of the apartment building in which she lived with her sister. Some keys were taken from her. The sister testified that, at the time when her sister was being detained in the garage, she heard a noise at the apartment door. Opening it, she saw appellant walking away. When asked what he was doing, appellant replied that he had found some keys apparently belonging to her sister. He turned them over, and then left. The implication was that a purpose to steal in the apartment was thwarted.

identify either of them as the man outside your door?

MR. McDANIEL: Your Honor—

BY THE PROSECUTOR:

Q. Could you—

THE COURT: Just a minute. Come to the bench.

(Bench Conference.)

THE COURT: He has not completed his question, and so I don't know the basis of your objection.

MR. McDANIEL: He completed it when he asked could she identify either of these men as the person who came to the door.

And, of course, as I understand the question that the prosecutor asked, could she identify either of those men as the one outside her door, and certainly if—

THE PROSECUTOR: If she had identified them as the one, that could be a thing that you could go into, Mr. McDaniel, about her credibility later when she identified someone else, *and if she did not, of course, that would support the government's case that she was not eager to identify anyone.* (Emphasis supplied.)

MR. McDANIEL: The basis of my objection is that an examining party on direct examination may not bolster his case by proving the negative of that which he purports to urge as being a fact.

Now, I say that this witness has from the stand identified this defendant as the person whom she said was outside her door.

Now, the government may not, over my objection, and if the court permits it, and she said she could not identify the two men, and for him to say these two men were not outside of my door with an idea of reenforcing the case on identification, I say that it cannot be done.

THE COURT: I am inclined to agree with you, but for a different reason.

She has already testified that on the 28th she did not see Jackson or Martin, and so I don't see any need to pursue it any further.

THE PROSECUTOR: All right.

(End of Bench Conference.)

In his primary summation to the jury, the prosecutor put great stress, as he was entitled to do, upon the high calibre of the sister as a witness. He characterized her as "an intelligent, able and totally honest witness," and he particularly referred to "the carefulness with which she testified." This is what followed:

You know that woman was called the next morning out in Virginia. Her sister had been attacked, raped, beaten, robbed. She left; went to Virginia. She knew by that time that two boys had driven off in the car. She was called to come down to Police Headquarters and she knew that two boys had been caught in the car later that night.

Now, put yourselves in that position. With some trepidation you would go down, certainly at her age, to see if you could recognize either one of those two boys as the one that came to your door. And knowing what she knew, the compulsion or the inclination to identify one of them must have been a factor to be contended with.

Did she identify either one of those two? Was one of those boys a broad-shouldered fellow, namely Jerome Martin? Yes. Was he lighter in color than the other boy? Yes. Was Stanley Jackson darker in color, shorter in height? Yes. Everything fit, ladies and gentlemen, Stanley Jackson and Jerome Martin, the two. But who stopped that inference? Celeste Stokes. She said: No, neither of these people can I recognize as the boy who came to my door.

Was she eager to identify someone? Was she trying to identify somebody or letting any one, police or anyone else influence her? Obviously not.

Does she know what she is talking about when she tells you David Garris is the man? Under those circum-

stances she said, no. The next day she was called back to view a line-up with eight to ten people. She said: Yes, I see him. And I believe she said from that witness stand, in answer to Mr. McDaniel's question: I told the police without a doubt, when I saw the lineup, it was David Garris.

Now, under those circumstances, ladies and gentlemen, I believe you have an idea of what type of person Miss Stokes is, whether she is subject to being influenced one way or another, whether she knows what she is talking about.

These passages from the transcript speak for themselves. They show a prosecutor who expressly stated that his purpose in trying to bring out certain facts was to provide support for his case. He was not permitted to get those facts into evidence.[2] Nevertheless, those facts were related to the jury, and relied upon heavily.

The Government does not now seriously contend that this was defensible as a matter of fair procedure.[3] It rests, rather, upon the fact that no protest was made by the defense at the time the argument was made, and urges that there was no plain error within the meaning of Rule 52(b), FED.R.CRIM.P. But, once the facts in question were suddenly stated to the jury in the course of the prosecutor's summing up, the defense might well have had to make a snap judgment as to whether only greater harm could come from interrupting the argument to the jury and thereby focussing the latter's attention even more emphatically upon the facts in question. We do not think the Government may now complain that the defense failed to impale itself upon one horn or the other of the dilemma imposed upon it by the prosecutor's lapse.

The Government also urges that no prejudice could have ensued because of the strength of its total case.[4] But, as

2. For the reason indicated in Note 3, *infra*, the trial judge did not respond directly to the defense objection. As explained in the argument on appeal, that objection was derived by analogy from the evidentiary rule which prohibits the introduction of prior consistent statements by an unimpeached witness. See, e. g., Gregory v. United States, 125 U.S.App.D.C. 140, 146, 369 F.2d 185, 191 (1966); Reichert v. United States, 123 U.S.App.D.C. 294, 359 F.2d 278 (1966); Johnson v. United States, 121 U.S.App.D.C. 19, 347 F.2d 803 (1965). We do not decide whether the analogy is apt, because the propriety of the prosecutor's summation does not turn upon whether the evidence should in fact have been admitted.

3. The Government argues that defense counsel should have known that, despite the earlier exclusion, the prosecutor was going to do what he did in summation because, as the Government puts it in brief, this was a "natural" part "of the prosecutor's coherently developed analysis of the case." In this regard the Government notes that, earlier in her direct testimony and over objection, the witness had been asked if she had seen either Martin or Jackson on the day of the crime. She answered that she had not; and this is what the trial judge was referring to when he sustained the objection in the portion of the transcript quoted above.

But what the prosecutor wanted to develop then was something quite different, namely, that the witness had confronted Martin and Jackson the next day after they had been picked up by the police in the stolen car, and had failed to identify either of them then as the man she had seen on the day of the crime. It was this circumstance which the prosecutor thought greatly enhanced the credibility of her later identification of appellant. Although the jury eventually learned in the course of the trial that Jackson and Martin had been found in the stolen car, the result of their confrontation by the witness on the day following the crime was never made known except through the prosecutor's summation.

4. Appellant himself testified, and produced other witnesses, in support of an alibi defense. The case against him, apart from the identification putting him at the scene of the crime, consisted of three articles found in his room which assertedly linked him with the crime. One of these was a pair of tennis shoes with markings similar to those observed on the floor of the garage; another was a pair of fur-lined gloves from which some hairs were allegedly found on the clothes of the victim; and the third was a key case identified by the victim as hers. In this posture, we think the prosecutor was correct in his as-

noted above, the emphasis placed by the prosecutor upon the extra-record facts in his summation indicates his high appraisal of their importance. His own estimate of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice. Taking that estimate into account, we find a new trial to be necessary.

It is so ordered.

sumption that the eye-witness testimony was quite important, and that it was de-

sirable to provide every possible foundation of credence for that testimony.