**UNITED STATES of America**

v.

**William L. DeLOACH, Sr., Appellant.**

**No. 73–1194.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 1974.

Decided March 1, 1974.

Thomas R. Asher, Washington, D. C. (appointed by this court), for appellant.

William D. Pease, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and John A. Terry and Stephen W. Grafman, Asst. U. S. Attys., were on the brief, for appellee. Earl J. Silbert, U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and WYZANSKI,[*] Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

Appellant DeLoach and a co-defendant, Harry Jackson, were tried on an indictment charging each with the first degree murder[1] of two individuals, Francis Harper and Brenda Willis, and with carrying an unlicensed pistol.[2] The jury acquitted Jackson of all charges but convicted DeLoach of two counts of second degree murder[3] and of the weapons charge. This appeal proceeds on three theories: that the conduct of closing arguments prejudiced DeLoach's case, that the trial judge's instruction to the jury on "aiding and abetting" was unclear, and that the judge erred in summarily denying appellant's pretrial motion challenging the jury selection system then in force in the District of Columbia.

We find that certain restrictions imposed on the closing argument of appellant's counsel were erroneous and that, in the context of this case, the errors were not harmless. Accordingly,

we reverse the convictions. As for appellant's claim regarding the instruction on "aiding and abetting," we find no lack of clarity when the jury charge is considered as a whole. The jury selection motion was properly denied by the District Court for the motion was not timely filed.[4]

## I. THE EVIDENCE

The Government relied almost entirely on the testimony of a confessed accessory to the homicides, Stephen Davis, whose appearance was compelled under a grant of immunity pursuant to 18 U.S.C. § 6002 (1970). To demonstrate the importance of his testimony, we precede it with a brief summary of the other evidence introduced by the Government.

The police found the murder victims at about 6:40 p.m., September 26, 1971, near an intersection in the Northeast section of the District of Columbia. Brenda Willis, in the front passenger seat of a parked Cadillac, had two bullet wounds in the head, fired at close range, and a third wound in her shoulder; a .38 caliber slug was later found in her sinus cavity. She never recovered consciousness and died at the scene. Francis Harper, lying in the street nearby, had five bullet wounds. Two .38 caliber slugs and one .22 caliber slug were removed from his body. The .22 slug had entered the right side of Harper's face from extremely close range. He told officers he knew who had shot him; the name he mumbled before he died sounded to an observer like "Lloyd" or "Floyd." The police never found the murder weapons, nor could any fingerprints be lifted from the car. On the front seat of the Cadillac officers found a large bowl containing heroin and co-

---

[*] Of the United States District Court for the District of Massachusetts, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. 22 D.C.Code § 2401 (1973).

2. 22 D.C.Code § 3204 (1973).

3. 22 D.C.Code § 2403 (1973), a lesser included offense of first degree murder.

4. The motion was filed on the day of trial, which is too late in view of the complexity of the issues raised. United States v. Greene, 160 U.S.App.D.C. 21, 24, 489 F.2d 1145, 1148 (decided Oct. 4, 1973). That case did not reach the substantive merits of the jury selection issue. Nor do we.

caine valued at $4,000. Narcotics paraphernalia was found in the car, and autopsies revealed drugs in the blood of both victims.

The Government put on several eyewitnesses but conceded in opening argument that none would be able to identify the defendants; none was asked to do so. *While the witnesses' descriptions of persons glimpsed at the murder scene did not appear to fit DeLoach, several of the descriptions did appear to fit Stephen Davis.*[5] Within about ten minutes of finding the victims, the police issued a radio call for a truck which several of the witnesses had observed leaving the scene. Almost immediately, responding officers stopped a nearby truck driven by Davis in which Jackson was a passenger. The two men were released after brief questioning since the truck did not precisely fit the description in the radio call. That night Harper's brother visited DeLoach, a friend of Harper, to tell him about the murders. While DeLoach professed surprise and sorrow, he kept a gun near him during the conversation.[6]

Such would have been the case absent Davis' testimony. The day after the murders, however, Davis engaged a lawyer and made a voluntary statement to the police about the affair. He was charged with first degree murder but released on bond. On April 28, 1972 an indictment issued charging Davis, Jackson, DeLoach, and Joseph Jackson, Davis' employer, with murder, conspiracy to murder, and possession of unlicensed weapons. But on the day of trial, August 21, 1972, the Government secured dismissal of all charges against Joseph Jackson and Stephen Davis and of the conspiracy charge against all defendants. Davis was granted immunity and ordered to testify.

His testimony matched his earlier statement to the police: DeLoach had asked Davis and Jackson to drive him in the truck to Chillum, Maryland on the day of the murders. Along the way DeLoach got out to make a phone call and returned to tell his friends that the people he wished to see were not at home. A few minutes later, however, DeLoach saw a Cadillac several car lengths ahead and said, "There is the people that I want to see." Appellant got out of the truck and instructed Jackson to accompany him. As these two approached the Cadillac from opposite sides, Davis drove the truck around the corner. A moment later Davis heard gunshots and, at the same time, Jackson got back into the truck. Through the side mirror Davis saw DeLoach running up the street with a gun in his hand and also saw a body lying on the sidewalk. DeLoach reboarded the truck and the three drove off. DeLoach got out after several blocks, before the truck was stopped by the police, and Davis did not see him again until several months later, in court. Such was the story of the murders as told by Davis.

## II. THE CONDUCT OF CLOSING ARGUMENTS

### A. *The Restrictions on the Argument of Appellant's Counsel*

Appellant's counsel used the bulk of his closing argument to show that none

---

5. DeLoach is a 55-year-old black man weighing about 250 pounds. Davis is a younger black man with a medium "bush" hairstyle; on the night in question he was, according to police testimony, wearing a white shirt with stripes and dark trousers. Witness Hamiel described the man who shot Harper as being 45 to 50 years old, weighing 155 pounds, 5' 7", wearing a light hat and a brown jacket. Witnesses Charlene and Darlene Medlock saw two men emerge from the Cadillac, one falling out and the other jumping out and running. Charlene described the latter, who may have had a gun, as black, in his 30's, wearing a white waist-length coat.

Darlene described him as tall, black, with a short "bush" hairstyle, wearing a white jacket. From a nearby window, witness Putney saw a man lying in the gutter and another man running up the street; the latter she described as black, dark complexioned, 30 to 40 years old, wearing dark grey clothes and a hat.

6. DeLoach told Harper's brother that he, DeLoach, had spoken by phone with Harper that day. A defense witness stated that he had been with Harper when the phone conversation occurred and that it had been amicable.

of the evidence and testimony other than Davis' story incriminated DeLoach. This was necessary spadework, but it left unanswered why the jury should doubt Davis' testimony and how the murders occurred if not as Davis recounted. At the climax of his argument, counsel addressed these questions by attempting to show that Davis may have committed the murders himself. This attempt foundered in a sea of prosecution objections. To show the impact of these objections, we must resort here to rather lengthy quotations from the record.

MR. TREANOR [appellant's counsel at trial]:

\* \* \* \* \* \*

Without Mr. Davis, there is no evidence against Mr. DeLoach.

And, what do you think of his story? We can start with the 28th of September when Officer Fickling saw the Defendant DeLoach in his own home and didn't make an arrest.

[PROSECUTOR]: Objection, your Honor. That is not in evidence. There is no evidence of that whatsoever.

THE COURT: Come to the bench. Tr. 878–879. After much haggling at the bench, the prosecutor conceded that appellant's counsel had indeed introduced the evidence to which he had adverted. The court properly overruled the prosecutor's objection. Several moments later appellant's counsel began to argue how the murders might have occurred:

[By Mr. Treanor] \* \* \*

This is what happened that weekend ladies and gentlemen. This is Defendant DeLoach's theory of the case \* \* \*

\* \* \* \* \* \*

So Davis stops the truck, and he gets out and goes back and gets in Harper's car. And, he has no thought in his mind of killing anybody.

[PROSECUTOR]: Your Honor, I hate to object again, but there is nothing in the record to support that.

THE COURT: I sustain that. We can't get into his mind. Disregard that.

MR. TREANOR: All right.

He had been drinking. He got into the back of the vehicle. Mr. Harper was there. Miss Willis was there. They were using narcotics.

[PROSECUTOR]: Your Honor, I object again. He is speculating to something that there is nothing in the record about.

MR. TREANOR: Well, we know they are in the car.

THE COURT: Where did you get this?

MR. TREANOR: May we come to the bench?

THE COURT: Come to the bench. (At the bench.)

THE COURT: This is speculation.

MR. TREANOR: My theory of the case is that Davis went back—

THE COURT: You have to get evidence.

MR. TREANOR: He turns state evidence.

THE COURT: He may have turned state's evidence. You may have wonderful theories, but you need evidence. I have ruled against you.

MR. FOGEL [Jackson's counsel]: When he is through, can we take five minutes?

THE COURT: We will see. Keep going.

(In open Court.)

THE COURT: Ladies and gentlemen, disregard that last statement of Mr. Treanor.

MR. TREANOR: There was a quarrel of some kind inside this vehicle. He said that Mr. Harper was on the driver's side and Miss Willis was on the other side. Whatever happened, the defense would argue to you that Miss Willis had in her possession the .22.

[PROSECUTOR]: Your Honor, I object. There is nothing to support that.

THE COURT: Come to the bench. (At the bench.)

THE COURT: Where is there evidence that she had a 22 in her possession?

MR. TREANOR: The bullet went from right to left, which meant it was fired from the passenger's side of the car.

THE COURT: You have no evidence that she had in her possession a 22.

MR. TREANOR: Your Honor, the inference came from the fact that there were open bags on the se[a]t, and they were selling narcotics. They would have carried weapons for their own protection.

THE COURT: I am sustaining the objection. You quit this fantasy you are getting into.

(In open court.)

THE COURT: Ladies and gentlemen, disregard that last statement. Tr. 882–885.

Obviously flustered, appellant's counsel quickly wound up his argument by suggesting, in several sentences, that the Government had not shown DeLoach's "motive" for the murders. Counsel then moved for a mistrial, which motion was denied.

B. *The Restrictions Were Erroneous*

■ A criminal defendant's constitutional rights to counsel and to a jury trial encompass a right to have his theory of the case argued vigorously to the jury. United States v. Sawyer, 143 U. S.App.D.C. 297, 298 n. 5, 443 F.2d 712,

713 n.5 (1971); Matthews v. United States, 145 U.S.App.D.C. 323, 449 F.2d 985 (1971); United States v. Hammonds, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970).

The trial court has broad discretion in controlling the scope of closing argument. That discretion is abused, however, if the court prevents defense counsel from making a point essential to the defense.

In regulating the scope of argument, the court should be guided by criteria that are related to the function of argument, *i.e.*, to help the jury remember and interpret the evidence. The prosecutor and the defense counsel in turn must be afforded a full opportunity to advance their competing interpretations * * *. The court should exclude only those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.

United States v. Sawyer, *supra*, 143 U. S.App.D.C. at 298–299, 443 F.2d at 713–714. (Footnotes omitted.) *See* Loveless v. United States, 104 U.S.App.D.C. 157, 260 F.2d 487 (1958).

■ The trial judge was apparently concerned that appellant's counsel was trying to present facts or representations of fact *dehors* the record, which would of course be impermissible.[7] But this concern was misplaced. Counsel's plain intent was not to supplement or misstate the record but, as was quite proper, to suggest that the jury draw certain inferences from it.[8] Thus he began his analysis with the clear statement that "[t]his is Defendant De-Loach's theory of the case," a formula

---

[7]. It is elementary * * * that counsel may not premise arguments on evidence which has not been admitted. Johnson v. United States, 121 U.S.App.D.C. 19, 21, 347 F.2d 803, 805 (1965). (Footnote omitted.)

[8]. On the distinction between misstating the record and drawing inferences from it, *see* United States v. Terrell, 2 Cir., 474 F.2d 872, 876–877 (1973); United States v. Dibrizzi, 2 Cir., 393 F.2d 642 (1968); American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Defense Function § 7.8(a) and Commentary thereto (Approved Draft 1971) (hereinafter "ABA Project"). *Cf.* Lawn v. United States, 355 U.S. 339, 359–360 n.15, 78 S. Ct. 311, 2 L.Ed.2d 321 (1958).

repeated moments later at a bench conference. Similarly, counsel did not state that the record definitely showed Brenda Willis' possession of the .22; rather, he stated:

> Whatever happened, the defense *would argue to you* that Miss Willis had in her possession the 22.

(Emphasis added.) Concededly, counsel could have decorated his argument more liberally with such *caveat* phrases as "we would argue," "we submit," "you may infer," and the like [9]; the judge could have properly reminded him to distinguish for the jury in each instance what was in the record from what might be inferred from it.[10] But the rulings here were not such reminders. Rather they entirely precluded counsel from arguing for the several inferences on which his case crucially depended.

This was error, for the record contained sufficient support for these inferences. *Compare* United States v. Dixon, 152 U.S.App.D.C. 200, 469 F.2d 940 (1972). Counsel's theory that Davis had been in the Cadillac was supported by eyewitness testimony that a man roughly fitting Davis' description had jumped from the car and run up the street.[11] Counsel's theory that Willis and Harper "were using narcotics" was supported by the autopsy report and by the cache of drugs found on the car's front seat. Counsel's theory that Brenda Willis, the passenger in the Cadillac, may have possessed the .22 was supported by the fact that Harper was shot by the .22 in the right side of his face at very close range, and by the common-sense inference that drug dealers would very likely arm themselves before driving about the city with $4,000 worth of narcotics.

■■ A trial judge may not impose on a jury his own notion of which inferences are reasonable.

> Now in this domain of logic, it is conceded, the counsel is free from restraint during argument. His desired inferences may be forced, unnatural, and untenable; but as to this the jury are to judge; that is precisely their function. To declare the desired inference irrational is to beg the question, by prejudging what the jury may believe.

6 J. Wigmore, Evidence § 1807(3), p. 272 (3d ed. 1940). This rule has special force in the present case, for "[i]f an accomplice has testified against the defendant, defense counsel may argue that the accomplice is seeking to protect himself or a friend." ABA Project, *supra* note 8, Commentary to § 7.8(b). But in every criminal case, defense counsel should have wide latitude in drawing inferences from the record. *See* United States v. Chas. Pfizer & Co., 2 Cir., 426 F.2d 32 (1970), affirmed by equally divided Court, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972); *cf.* United States v. Gorostiza, 9 Cir., 468 F.2d 915 (1972); Wakaksan v. United States, 8 Cir., 367 F.2d 639, 646 (1966), cert. denied, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967).

Arguing both first and last, the prosecutor has ample opportunity to re-

---

9. By use of such phrases counsel also makes clear that he is not presenting his personal beliefs or opinions, which would be improper. *See* ABA Project, *supra* note 8, Commentary to § 7.8(b).

10. Even such reminders should be used sparingly. Defense counsel argues only once, and interruptions can seriously compromise his effect on the jury. As Judge (now Chief Justice) Burger has noted:

> [A] trial judge should not interrupt every argument which he thinks undesirable. Here as in other areas there are "gray zones" of argument which, though they should not be made, do not warrant interruption * * *. The problem is one of balance; a serious transgression is impermissible by definition and it is as to these that intervention by the trial judge is called for. Other deviations can be dealt with by the trial judge's post-trial admonition to counsel to avoid repetition of any departure from proper argument. This has long been an accepted method of instructing lawyers on courtroom conduct. Harris v. United States, 131 U.S.App.D.C. 105, 106 n.1, 402 F.2d 656, 657 n.1 (1968).

11. *See* note 5 *supra*.

but the inferences suggested by defense counsel.[12] Furthermore, the presumption of innocence, the reasonable doubt standard, and the prohibition on directed verdicts of guilty combine to leave standing few if any limitations on the factual inferences which a jury may properly draw in the defendant's favor.

### C. *The Error Was Not Harmless*

■ The restrictions imposed upon the argument of appellant's counsel were not harmless beyond a reasonable doubt.[13] They cut to the core of counsel's theory of the case,[14] and their impact was aggravated by the wide-ranging summations which the prosecutor and Jackson's counsel were able to make to the jury. That some of the prosecutor's remarks were improper added to the prejudicial effect.

The restrictions prevented appellant's counsel from suggesting to the jury that

Davis may have committed the murders and lied about DeLoach to cover up his own guilt. Whether this argument would have convinced the jury cannot be known. But the theory had support, however fragmentary, in the record, and without it DeLoach was "deprived of the substance of his defense." United States v. Sawyer, *supra*, 143 U.S.App.D.C. at 299, 443 F.2d at 714; *see* United States v. Chas. Pfizer & Co., *supra*, 426 F.2d at 43–45. The Government reminds us that the erroneous rulings amputated only the "final few minutes of argument." Brief for appellee at 16. But it is these minutes which probably have the greatest influence on the jury,[15] especially where, as in this case, counsel has reserved his major points until the very end. If these concluding remarks by counsel had really been unimportant, the prosecutor would not, we think, have objected to them so strenuously; nor would he have devoted

---

12. Many cases recognize that the prosecutor may go beyond the normal bounds of proper argument to meet an issue introduced by defense counsel's argument. *See, e. g.,* United States v. Hodges, 10 Cir., 480 F.2d 229, 234 (1973); United States v. Gillis, 9 Cir., 474 F.2d 4, 5 (1973); United States v. Lipton, 2 Cir., 467 F.2d 1161, 1168–1169 (1972), cert. denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); United States v. Fort, 143 U.S.App.D.C. 255, 443 F.2d 670 (1970), cert. denied, 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971); United States v. Parker, 136 U.S.App.D.C. 97, 419 F.2d 679 (1969); Keys v. United States, 120 U.S.App.D.C. 343, 346 F.2d 824, cert. denied, 382 U.S. 869, 86 S.Ct. 144, 15 L.Ed.2d 108 (1965). Given this power of rebuttal, the prosecutor need not and should not use harassing objections to restrict the inferences which defense counsel wishes to urge upon the jury.

13. In determining whether an error is "harmless" under 28 U.S.C. § 2111 (1970) and Rule 52(a), Fed.R.Crim.P., a court must use the "reasonable doubt" test where the error is of constitutional dimensions. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The errors here impaired appellant's constitutional right to closing argument in his behalf. *See* United States v. Sawyer, 143 U.S.App.D.C. 297, 443 F.2d 712 (1971); Matthews v. United States, 145 U.S.App.D.C. 323, 449 F.2d 985

(1971); United States v. Hammonds, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970). However, we would reverse here even if the error lacked constitutional overtones, for we cannot say that "the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

14. When an error appears during closing argument, the centrality or importance of the issue infected by error is a significant factor in determining whether prejudice resulted. Gaither v. United States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969); King v. United States, 125 U.S.App.D.C. 318, 330, 372 F.2d 383, 395 (1967); *see also* United States v. Wasko, 7 Cir., 473 F.2d 1282, 1283 (1973).

We have also given some weight to the fact that this case, resting on the testimony of a single, self-interested witness, must be classed as a close one. *See* Milton v. Wainwright, 407 U.S. 371, 372, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). This would be a larger factor were the error not of constitutional dimensions. *See* United States v. Jones, 157 U.S.App.D.C. 158, 165, 482 F.2d 747, 754 (1973); Gaither v. United States, *supra.*

15. *See* Walker, Thibaut & Andreoli, Order of Presentation at Trial, 82 Yale L.J. 216, 224 (1972).

much of his rebuttal to ridiculing the theory of Davis' sole culpability.

> [A prosecutor's] own estimate of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice.

Garris v. United States, 129 U.S.App.D. C. 96, 100, 390 F.2d 862, 866 (1968).

Because of the erroneous restrictions on appellant's counsel, the closing argument phase of the trial was not well balanced. Appellant's counsel could not speculate about Davis' state of mind and motives, but the prosecution freely engaged in similar speculation about the defendant's.[16] Appellant's counsel could not speculate about Willis' possession of the .22 but the prosecution freely argued its own theories about the murder weapons.[17] And Jackson's counsel met no prosecutorial objection in making some of the arguments specifically foreclosed to DeLoach's counsel.[18] Obviously, the trial judge intended no partiality. Nevertheless, we cannot rule out the possibility that the jury inferred from the asymmetry in closing arguments that the judge approved the theories of the prosecutor or of Jackson's counsel and disapproved those foreclosed to De-Loach's counsel.[19]

It is obvious that under any system of jury trials the influence of the trial

---

16. * * * Miss Willis, unfortunately, was a victim of circumstances. She was a witness to the whole thing. She had to be taken care of. You can't come up there and kill Mr. Harper—They obviously weren't expecting Miss Willis to be in the car, but once she was there, they can't leave a witness to this case.

Again, deliberation and premeditation. "We have not only got to get rid of the person we want to get rid of, but we have got to get rid of the witness ourselves." Tr. 841–842.

* * * May you not infer that Mr. DeLoach was a little apprehensive at that point, and he figured he had better go down there with a gun in his hand in case there was any trouble.

* * * * *

* * * He was going to play like he didn't know anything. But, he wasn't going to take any chances with Johnny Harper when he went down to that door * * * *. * * *
Tr. 853.

* * * Johnny Harper came over there, and Mr. DeLoach thought, "Oh, my God, he knows I have killed his brother." * * *
Tr. 925.

* * * All they would have had to have done was reach over and take $4,000 in wholesale value of narcotics, but they didn't do it, because they had something else on their minds. They had an execution on their minds of Francis Harper. And, unfortunately Brenda Willis happened to be there and was an unnecessary witness. And, dead witnesses tell no tales. So, she had to go also. Tr. 931–932.

17. The only link established between De-Loach and the murder weapons, which were never found, was Davis' claim to have seen (through a car mirror) DeLoach running up the street with a gun in his hand. Davis did not claim to have seen either DeLoach or Jackson with a gun at any other time on the day of the murders. Yet the prosecutor argued:

* * * Is that not consistent with when Francis Harper was fired at with that first 22 round that she started to turn around to see what was happening, and she was on the left hand side of that car, and Mr. DeLoach who was on the passenger's seat reached over with his 38 and took care of her. * * *
Tr. 842.

And, they get in a truck and they drive eight miles, taking approximately 20 to 25 minutes driving time, with a loaded 38 and a loaded 22 in their possession. * * *
Tr. 931.

18. Jackson's counsel was permitted to suggest that Davis had left the truck and entered the Cadillac, and also that the .22 pistol belonged to Brenda Willis. The Government does not claim that these remarks benefitted appellant sufficiently to cure the erroneous restrictions placed on his own counsel's argument. Jackson's counsel stated to the jury before beginning argument that he represented only Jackson. The two defendants had distinct interests in the closing argument phase of the trial, for Davis' story had assigned them very different roles in the murders. Thus it cannot be assumed that Jackson's counsel made his argument in a fashion well calculated to further DeLoach's case.

19. As the trial court's error lay in restricting appellant's counsel, rather than in failing to restrict the prosecutor or Jackson's counsel, the asymmetry cannot—as the Government urges—be blamed on the failure of ap-

judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling. * * *

Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894). *See also* Quercia v. United States, 289 U.S. 466, 470–472, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); United States v. Nazzaro, 2 Cir., 472 F.2d 302, 313 (1973). *Cf.* United States v. Dellinger, 7 Cir., 472 F.2d 340, 387 & 390 (1972), cert. denied, 410 U.S. 970, 93 S. Ct. 1443, 35 L.Ed.2d 706 (1973).

 Finally, the prosecutor's closing argument did not always remain within the limits of propriety established by the Supreme Court.

He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. * * *

Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The prosecutor stated that Harper had been "shot down like a dog in the street," a phrase condemned five years ago by

Judge (now Chief Justice) Burger as being inconsistent with "the dignity of the Government." Taylor v. United States, 134 U.S.App.D.C. 188, 189, 413 F.2d 1095, 1096 (1969). The prosecutor also insisted on characterizing the murders as "executions" and "assassinations." This court recently made clear that "we do not condone" use of the former term. United States v. Jones, 157 U.S.App.D.C. 158, 164, 482 F.2d 747, 753 (1973). We also think that, "in the context of current events," the term "assassination" constitutes an unnecessary appeal "to passion and prejudice." *See* Brown v. United States, 125 U.S.App.D.C. 220, 224, 370 F.2d 242, 246 (1966). Just last year, we strongly disapproved a prosecution argument comparing a murder to the notorious political assassinations of the 1960's. United States v. Phillips, 155 U.S.App.D.C. 93, 476 F.2d 538 (1973) (*per curiam*). As Judge (now Chief Justice) Burger has noted:

It is counsel's responsibility to know the ground rules and follow them.

Gibson v. United States, 131 U.S.App.D. C. 163, 164 n.1, 403 F.2d 569, 570 n.1 (1968).[20]

Reversed.

---

pellant's counsel to object to the broad arguments of the prosecutor and of Jackson's counsel. The broad arguments on all sides were proper and thus invulnerable to objection. At any rate, interruptions and bickering are to be discouraged during closing arguments. *See* note 10 *supra.*

20. Counsel failed to object to use of the terms "execution" and "assassination." Objection was raised to the phrase "shot down like a dog," and the trial court instructed the jury to disregard the phrase. We need not decide whether, in this context, the prosecutor's remarks were sufficient in themselves to warrant reversal. We view them merely as factors to be weighed in assessing the prejudicial impact of the court's erroneous rulings on the argument of appel-

lant's counsel. But we remind the Government that some remarks cause prejudice which is not eradicable by subsequent judicial instructions, Gaither v. United States, *supra* note 14; King v. United States, *supra* note 14, and that a defendant's failure to object is not dispositive, Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734 (1943); United States v. Jones, *supra* note 14, 157 U.S.App.D.C. at 164, 482 F.2d at 754; United States v. Young, 150 U.S.App.D.C. 98, 104, 463 F.2d 934, 940 (1972). It is obviously unrealistic to expect defense counsel to object when the prosecution characterizes a murder as an "execution" or "assassination"; the objection would make the counsel, and his client, seem at once callous and overly fussy.