**Eric R. GARDNER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 07–CF–573.

District of Columbia Court of Appeals.

Argued Feb. 2, 2010.
Decided July 8, 2010.

Sloan S.J. Johnston, Public Defender Service, with whom James Klein and Alice Wang, Public Defender Service, were on the brief, for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Channing D. Phillips, United States Attorney at the time the brief was filed, Roy W. McLeese III, and Michelle D. Jackson, Assistant United States Attorneys, were on the brief, for appellee.

Before KRAMER and OBERLY, Associate Judges, and PRYOR, Senior Judge.

KRAMER, Associate Judge:

Appellant Eric Gardner appeals from his convictions for first-degree felony murder while armed, second-degree murder while armed, attempted robbery while armed, two counts of possession of a firearm during a crime of violence ("PFCV"), and one count of carrying a pistol without a license ("CPWL"). Appellant argues that the admission of the results of forensic DNA and serology testing through a DNA laboratory report and forensic expert testimony violated his Sixth Amendment right to confront witnesses against him because he was unable to cross-examine the forensic scientists who actually performed the tests. We agree that the admission of the DNA report and the testimony of both experts was error. We conclude that the errors were not harmless beyond a reasonable doubt and reverse.

## I. Factual Background

Andrew Kamara, a fifty-year-old D.C. taxi driver, was shot to death while driving his cab during the night of November 12, 2004. At trial, the government's theory was that appellant had been a passenger in Kamara's cab when he shot and killed Kamara in an attempted robbery. The evidence presented at trial showed that Metropolitan Police Department (MPD) officers responded to the scene and obtained a description of events from Mary Ball, a neighborhood resident. Ball reported hearing a loud crash as Kamara's cab struck a nearby parked car, and seeing a "tall lean and young" man wearing a dark jacket "running from the cab." MPD officers then canvassed the area for a man matching Ball's description, beginning with the Motel 6 because of its proximity to the scene and the officers' belief that the motel "would be a prime spot for someone to go hide if they had just, in fact, committed a crime."

At the Motel 6, the front desk clerk confirmed that a man wearing dark clothing had quickly walked through the lobby to Room 114 fifteen minutes prior to the officers' arrival. The clerk, however, did not see the man's face and did not identify appellant as the man he saw. While some of the officers were staking out Room 114, an officer posted outside the motel saw appellant climb out of the window of Room 114 and drop a "black object" to the ground. Appellant attempted to flee as soon as he spotted the officer. Officers quickly caught and arrested appellant, and then secured the dropped objects by placing a cotton-lined plastic police blanket over the evidence to protect it until it

could be collected. The evidence turned out to be a jacket, a black handgun, and a boot. The officer who identified the objects testified that she did not see any blood on appellant's jacket, but added that "[she] wasn't looking for it."

Ballistics testing revealed that the gun appellant had dropped from the motel window was not the gun used to shoot Kamara. The day after the shooting, MPD officers did find the murder weapon hidden under a porch in a nearby alley. No fingerprints were retrieved from the gun that killed Kamara, but the government attempted to link this gun with appellant's gun by proving that both guns contained "reloaded" ammunition produced using the same reloading tool.[1] The MPD ballistics expert, however, diminished the significance of this link by testifying to the fact that there are between 200 and 1,000 commercial manufacturers of reloaded ammunition in the United States, that reloaded ammunition is sold at "almost any store that sells firearms," and that a single reloading tool can be used on "tens of thousands" of cartridges, marking each casing in the same way.

Further investigation revealed that appellant's jacket had a smear of blood on it. Serology and DNA test results on the smear concluded that the victim could not be excluded as a "possible predominant contributor" to the DNA mixture found on the jacket. The DNA expert testified that the likelihood of a coincidental match was 1 in 6.3 billion (nearly the population of the world). At trial, the government admitted the DNA test report into evidence and presented the expert testimony of Dr. Robin Cotton, a representative of Orchid Cellmark ("Cellmark"), a private forensic laboratory with an FBI contract for DNA testing and analysis, and Ms. Caroline Zervos, an FBI serology analyst. The government did not, however, present the testimony of any of the scientists or analysts who conducted the serology testing at the FBI or the DNA testing at Cellmark.

To rebut the forensic evidence at trial, defense counsel suggested that the investigating officers may have inadvertently contaminated appellant's jacket with the victim's blood. In support of this theory, counsel highlighted the fact that there was only a small amount of blood on appellant's jacket, despite the immense amount of blood at the crime scene; the fact that the cotton lining of the police blanket did not have any blood on it despite the fact that it covered the jacket for some time and was pressed down upon the jacket by rainfall; and the fact that the same officers who "handled the plastic bag containing Mr. Kamara's bloody clothing" secured and collected the jacket. Before going to trial, appellant filed a motion *in limine* to preclude the government's proposed DNA expert, Dr. Robin Cotton, from testifying about the DNA test results obtained by another forensic scientist on Sixth Amendment Confrontation Clause grounds.[2] This motion was denied.[3]

---

1. "Reloading" is a recycling process, whereby spent shell casings are filled with new powder, primer and a new bullet. The tool which holds the spent shell case during the process leaves a distinctive mark.

2. Appellant did not file a motion regarding Ms. Zervos's testimony because the government planned to present Rhonda Craig, the FBI analyst who conducted the serology test-

ing. Appellant was not made aware of Craig's replacement by Ms. Zervos until trial.

3. Judge Dixon, who ruled on the pre-trial motion *in limine,* concluded that "[t]here is absolutely no question ... that Dr. Cotton is permitted to testify with respect to her opinion based on her analysis of the data" and that Dr. Cotton was "entitled to rely on th[e] data from those individuals in the lab ... so that she can render her opinion." Judge Dix-

Lastly, Lawrence Pryor, appellant's temporary cell-mate at the D.C. Jail, testified at trial for the government. He testified that appellant confessed to shooting a man after attempting to rob him, and that appellant admitted that the victim's blood had gotten on his jacket. Pryor was impeached with his incentives for testifying. He conceded that he had initiated the conversations with appellant and that he reached out to the prosecutor in search of a deal. In exchange for his testimony, Pryor was transferred to a better jail, all pending charges of first-degree murder, PFCV and CPWL against him were dropped, he pled guilty to a single count of second-degree murder, and his sentence was thus reduced from a maximum of eighty years in prison to forty years with no mandatory minimum. Pryor admitted that he testified in this case, as well as in another case, in hopes that he would obtain a better sentence, and he acknowledged that the government has sole discretion to decide whether he had provided "substantial assistance."

Appellant was convicted and sentenced to forty years of incarceration and eight years of supervised release. This appeal followed.

## II. Standard of Review

■ Where a statement is admitted into evidence in violation of the Confrontation Clause of the Sixth Amendment and the error was objected to below, we review the error for harmlessness beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See also Lewis v. United States*, 938 A.2d 771, 782 (D.C.2007). We have found constitutional error harmless where the government presented "overwhelming evidence of guilt" or "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Smith v. United States*, 966 A.2d 367, 391 (D.C.2009) (quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) and *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)) (internal quotation marks omitted).

## III. Legal Analysis

■ The government concedes that the conclusions set forth in the DNA and serology reports were "testimonial" under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).[4] The government further concedes

on explicitly left the decision on the admission of the substantive report to the trial judge.

4. Under *Melendez–Diaz* and *Roberts v. United States*, 916 A.2d 922 (D.C.2007), there is no question that this evidence was testimonial. The trial court admitted the DNA report as a business record, pursuant to the business record exception to the hearsay rule, concluding it "is admissible and ... it's not testimonial. It's a business record. It's a report by scientists who will follow a routinized procedure and aren't slanting it in any fashion, and they're reporting as scientists for an expert to discuss." This ruling was clearly erroneous because this court explicitly rejected that rationale in *Thomas v. United States*, 914 A.2d 1,

13–14 (D.C.2006) ("[W]here a document is created primarily for the government to use it as a substitute for live testimony in a criminal prosecution, the fact that the document might happen to fall within the jurisdiction's business records exception to the hearsay rule does not render the document non-testimonial."). Moreover, the Supreme Court has held that the results of the scientific analysis of evidence, such as DEA drug testing results, cannot be admitted at trial through the business records exception to the hearsay rule because "the regularly conducted business activity is the production of evidence for use at trial." *Melendez–Diaz, supra*, 129 S.Ct. at 2538 (internal citation omitted).

that the admission of these results, either through the admission of the DNA report or the expert testimony, violated appellant's rights under the Confrontation Clause of the Sixth Amendment because the scientists who actually conducted the testing were not available for cross-examination. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354; *Roberts, supra* note 4, 916 A.2d at 938. Thus, all of the experts' explicit references to the testing analysts' conclusions violated appellant's Sixth Amendment Confrontation rights. Nonetheless, the government contends that it was proper for both experts to testify *in reliance upon* the inadmissible information in the reports, namely the analysts' conclusions, and that the experts' "independent analyses" were thus admissible. The government also argues that any error in the admission of the DNA report and the scope of expert testimony was harmless beyond a reasonable doubt.

### A. Admission of DNA Testing Results through Dr. Cotton's Testimony and of Serology Testing through Dr. Zervos's Testimony was Constitutional Error [5]

█ At trial, Dr. Cotton testified regarding the results of DNA testing of the blood smear on appellant's jacket, a swab from appellant's face, and a swab from the murder weapon. Dr. Cotton did not perform the DNA testing herself and she did not supervise the analyst who performed the testing. In fact, Dr. Cotton worked in a lab in Maryland, but the tests were conducted in Texas. Dr. Cotton's only

involvement in this case was the "technical review" of the case file and lab report after it was mailed to her. Dr. Zervos, who did not conduct or supervise testing, testified about the results of serology testing of the blood smear from appellant's jacket. Like Dr. Cotton, she was the "technical reviewer" of the results and final report. While on the stand, both Dr. Cotton and Dr. Zervos read directly from the reports of the analysts who conducted the tests. Dr. Cotton also displayed and referred to enlarged copies of the lab report, which had been admitted into evidence, to help her explain the testing process and the results.

Despite conceding that the trial court erred in admitting into evidence the DNA test report and certain portions of the expert testimony, the government contends that the majority of the experts' testimony was proper and admissible because their "independent analyses" were the "key constituents" of their opinions. In putting forth this argument, the government heavily relies upon *In re Melton*, a psychiatric civil commitment case, for the proposition that hearsay evidence is routinely relied upon by experts in forming their opinions, and that it is acceptable for experts to rely upon information that is inadmissible as substantive evidence. 597 A.2d 892 (D.C.1991) (adopting Federal Rule of Evidence 703).[6] However, as appellant points out, the *Melton* opinion made clear that the underlying hearsay is only admissible for the limited non-hearsay purpose of "evaluating the reasonableness and correctness of [the expert's] conclu-

---

5. We do not address the admission of the DNA report into evidence because the government concedes that this was constitutional error.

6. Rule 703 of the Federal Rules of Evidence provides as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. . . .

sions, and not to establish the truth of the matters asserted...." *Id.* at 901 (quoting *United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir.1971) *(en banc ), cert. denied,* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972)). The *Melton* court stressed that this balance could only be achieved through the provision of a jury instruction limiting the use of the statement to its non-hearsay purpose.[7] Significantly, no limiting instruction was provided to the jury in this case.[8]

Moreover, appellant challenges whether such a *Melton* limiting instruction, even if one were given, would have insulated the expert testimony in this case from a Confrontation Clause violation. *Melton, supra,* 597 A.2d at 901; *Crawford, supra,* 541 U.S. at 68, 124 S.Ct. 1354. *Melton* addressed the reliability concern inherent in hearsay, holding that "a properly qualified expert is assumed to have the necessary skill to evaluate any second-hand information and give it only such probative force as the circumstances warrant," and instructing that "objections to the reliability of out-of-court material relied upon by [the expert] will be treated as affecting only the weight, and not the admissibility, of the evidence." *Melton,* 597 A.2d at 903–04.

*Crawford,* however, made clear that the reliability of an out-of-court statement does not override a Confrontation Clause problem: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with [a] jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354. *See also Thomas, supra* note 4, 914 A.2d at 14–15 ("Reliability no longer shields testimony from confrontation."). Thus, while the *Melton* rule may remain good law in terms of its applicability to hearsay concerns, *Crawford* may very well have narrowed the significance of *Melton.* We previously declined to resolve the question of *Melton's* relevance after *Crawford* in two similar cases, *Roberts v. United States*[9] and *Veney v. United States,*[10] and we decline to do so here as well. We need not determine whether the Confrontation Clause precludes the introduction of testimonial hearsay for the limited purpose of evaluating the soundness of an expert opinion because here the testimonial hearsay was admitted as substantive evidence, that is for the truth of the matter asserted, and no limiting instruction was provided to mitigate the problem.[11]

7. In *Melton,* the trial "judge specifically instructed the jury that any out-of-court statements by third parties which were reported in the experts' testimony were to be considered only 'for the purpose of evaluating the reasonableness and correctness of the doctors' conclusions' and not 'to establish the truth of the matters asserted....' " *Melton, supra,* 597 A.2d at 901.

8. In fact, the trial judge in this case instructed the jury that, when considering "the exhibits that were admitted into evidence," they were "permitted to draw from the facts you find have been proven such reasonable inferences as you feel justified."

9. *Roberts, supra* note 4, 916 A.2d at 939.

10. *Veney v. United States,* 929 A.2d 448, 469 (D.C.2007).

11. While declining to decide whether *In re Melton* survives after *Crawford,* we do note that the government submitted a large amount of persuasive case law from other jurisdictions which suggests that several federal circuit courts and state courts have ruled that Rule 703 of the Federal Rules of Evidence, and the similar state rules, did indeed survive. Regardless, that determination does not help the government in this case, where the experts did not simply rely upon inadmissible hearsay in forming their expert opinions. Rather, here, the experts repeatedly directly referred to the inadmissible hearsay evidence and thus used it to prove the "truth of the matter asserted." *Melton, supra,* 597 A.2d at

This case is analogous to *Veney, supra,* where an FBI DNA expert and supervisory analyst testified to the procedure and the results of the testing even though he had not himself conducted the DNA testing. In that case, this court found determinative the fact that "[the expert] made references to the serology tests and the data produced by the DNA-typing instrument" and that "[t]hese test results, therefore, were offered as substantive evidence." 929 A.2d at 469. Similarly, in *Roberts, supra,* a supervisory DNA analyst, who did not actually conduct the testing, "testified that the opinions he was testifying to were his own ... [because] he went 'through [the report] as if it's my case ... and [came] to [his own] conclusions and ... interpretation.'" 916 A.2d at 937–38. In that case, in the absence of a limiting instruction to the jury, this court held insufficient the expert's assertion that the conclusions were his own:

> Our review of the record confirms that, at least in part, [the expert's] opinion that appellant could not be excluded as a contributor to the DNA evidence *rested on the conclusions reached by the team that did the actual laboratory analysis* and set forth those conclusions in the report he reviewed.

*Id.* at 938 (emphasis added). In light of the fact that the conclusions of FBI laboratory scientists have been indisputably held to be "testimonial," the *Roberts* court concluded that the appellant's Sixth Amendment Confrontation rights could have been satisfied only by cross-examination of those scientists who actually conducted the testing. *Id.*

This case is controlled by *Veney* and *Roberts* because, like the experts in those cases, both experts quoted and directly referred to the conclusions of the lab analysts.[12] The Fourth Circuit has observed that:

> Allowing a witness simply to parrot out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion would provide an end run around *Crawford.* For this reason, an expert's use of testimonial hearsay is a matter of degree.... *The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay.*

*United States v. Johnson,* 587 F.3d 625, 635 (4th Cir.2009) (internal citation and quotation marks omitted) (emphasis added).[13] The government suggests that the majority of the expert testimony in this

---

901. Each of the cases presented by the government for the proposition that *"Melendez–Diaz* did not do away with FRE 703" can be easily distinguished from the case at hand, either because the evidence relied upon by experts was not testimonial or because the experts did not directly refer to the inadmissible hearsay evidence in their testimony.

12. As in *Veney,* both experts in this case repeatedly read from and directly referenced the testing results and conclusions of the analysts who conducted this test. In fact, Dr. Cotton's ultimate conclusion that "Eric Gardner cannot be excluded as the possible predominant donor to this mixture" was read directly from the DNA report. *Veney, supra,*

929 A.2d at 469. As in *Roberts,* no limiting instruction was given to the jury clarifying which portions of the expert testimony they could consider as substantive evidence. *Roberts, supra,* 916 A.2d at 939.

13. The Fourth Circuit further observed that "[a]n expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *Id.*

case was "independent judgment." *Id.* Accordingly, they urge us to answer the question that we declined to answer in our earlier cases and hold that the *Melton* rule survived *Crawford* and insulates the "independent assessments" of the experts from the Sixth Amendment.[14] In order to do this, the government suggests we break down the expert testimony, ignoring direct references to the inadmissible hearsay conclusions of the analysts who conducted the testing, and solely consider the independent opinions of the experts. This would require an impossible feat of mental gymnastics. Dr. Cotton's and Dr. Zervos's explicit reliance on and references to the reports prepared by third parties make it impossible to disaggregate their opinion testimony from evidence admitted in violation of the Confrontation Clause. Moreover, in the absence of a limiting jury instruction, such an analysis would be irrelevant because the jury clearly did not ignore the improper expert testimony.

## B. Errors Were Not Harmless

▮▮▮▮ We cannot conclude that the constitutional errors in this case were harmless beyond a reasonable doubt because the DNA evidence was the cornerstone of the government's case. *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824.[15] After the DNA report and the expert testimony are removed from consideration, the remaining circumstantial evidence is unconvincing.[16] This is clearly not a case where the government presented "overwhelming evidence of guilt." *Smith, supra,* 966 A.2d at 391. There were no witnesses to the crime and appellant's fingerprints were not found on the murder weapon. Moreover, the truth of the alleged "confession" was rendered highly suspect after the government informant was impeached with the ample rewards he received in exchange for his inculpatory testimony.

Moreover, this court has held that "[a prosecutor's] own estimate of his case, and

14. While the Supreme Court has yet to address this question, it notably did summarily reverse two such cases, where the forensic report of a non-testifying expert was admitted into evidence without limitations on its use, and a "reviewing" expert who did not perform the forensic testing testified and was cross-examined at trial as to her "own opinion" about the test results. *See Crager v. Ohio,* — U.S. ——, 129 S.Ct. 2856, 174 L.Ed.2d 598 (2009) (granting certiorari, reversing, and remanding in *State v. Crager,* 116 Ohio St.3d 369, 879 N.E.2d 745, 747–50 (2007)); *Barba v. California,* — U.S. ——, 129 S.Ct. 2857, 174 L.Ed.2d 599 (2009) (granting certiorari, reversing, and remanding in *People v. Barba,* 2007 WL 4125230 (Cal.Ct.App. Dec. 21, 2007)).

15. The government urges us to review the erroneous admission of Ms. Zervos's testimony under a plain error review standard because appellant did not file a motion *in limine* addressing Ms. Zervos and did not clearly object to her testimony on Confrontation Clause grounds. We decline to do so. The defense was not on notice that the testing

analyst, Rhonda Craig, would not be testifying as the serology expert until the day Ms. Zervos took the stand. Moreover, we find appellant's vague objection to Ms. Zervos sufficient to preserve the error in light of defense counsel's earlier Confrontation Clause objection to Dr. Cotton's expert testimony and both the trial court's and defense counsel's agreement that Ms. Zervos was a similarly situated expert.

16. The government makes much of the fact that the blood evidence could have come in through officer testimony even if the DNA report and the expert testimony had not been erroneously admitted. This court, however, has made clear that the "inquiry [under *Chapman*] ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether *the guilty verdict actually rendered in this trial was surely unattributable to the error."* *Ellis v. United States,* 941 A.2d 1042, 1049 (D.C.2008) (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

of its reception by the jury at the time, is ... a highly relevant measure ... of the likelihood of prejudice." *United States v. DeLoach*, 164 U.S.App.D.C. 116, 122, 504 F.2d 185, 192 (1974) (*quoted in Allen v. United States*, 837 A.2d 917, 923 (D.C. 2003)). The prosecutor here heavily relied upon the DNA evidence in securing a conviction, focusing significant portions of both his opening and closing arguments on the forensics. He even went so far as to suggest that the DNA evidence is the equivalent of a victim identification of appellant, stating "Mr. Kamara's telling you right now [that Gardner was the shooter], ... because that's where his DNA was found." The prosecutor also used the DNA evidence to corroborate other evidence in the case, such as Pryor's dubious testimony about appellant's jailhouse confession. Even if the government had presented more convincing evidence, we cannot underestimate the weight that juries give to forensic evidence, particularly DNA evidence.[17] Without the evidence that the appellant had the victim's blood on his clothing, it is certainly not "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Smith, supra*, 966 A.2d at 391.

*Reversed.*

---

17. *See United States v. Bonds*, 12 F.3d 540, 567–68 (6th Cir.1993) ("The aura of reliability surrounding DNA evidence does present the prospect of a decision based on the perceived infallibility of such evidence, especially in a case ... where the evidence is largely circumstantial.").

